UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| PAUL B. and JANICE K. SHUPE; STEPHEN SHUPE AND STANLEY ENTERPRISES, LLC; GRANT T. and HEIDI SHUPE; the OWEN K. SHUPE TRUST; KEITH SHUPE, TRUSTEE; and GRANT T. SHUPE and CHAD B. SHUPE; KARL M. SHUPE AND KEITH G. SHUPE, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF AGRICULTRURE, and UNITED STATES FOREST SERVICE, <br><br> Defendants. | Case No.: 1:20-cv-00561-REP <br><br> **MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION TO DISMISS** <br><br> **(Dkt. 16)** |

Pending before the Court is Defendants' Motion to Dismiss (Dkt. 16). All parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. (Dkt. 12). Defendants' Motion is granted because Plaintiffs failed to bring their quiet title action within the twelve-year statute of limitations. As a result, this Court lacks jurisdiction to hear Plaintiffs' claims and their Complaint must be dismissed.

## I. BACKGROUND

In 1956, the Shupe brothers purchased property on the Salmon River in Custer County, Idaho. Plaintiffs are the successors-in-interest to the Shupe brothers. Through this action, Plaintiffs seek to quiet title to certain rights-of-way relating to diversion facilities that bring water from a nearby water source to their adjacent property. Pls.' Compl. at 5 (Dkt. 1). The legal particulars of the claim provide a fascinating look into the interrelationship of Idaho's pioneering days and the federal government's subsequent reservation of huge swaths of land (the

**MEMORANDUM DECISION AND ORDER - 1**

property is located within the Salmon-Challis National Forest and the boundaries of the Sawtooth National Recreational Area ("SNRA")). Those aspects, however, are not before the Court. Instead, Defendants[1] move to dismiss Plaintiffs' Complaint as untimely.

Under the Quiet Title Act ("QTA"), there is no waiver of sovereign immunity for claims brought more than twelve years after they first accrued. The accrual date is determined from the date a plaintiff or his predecessors-in-interest knew or should have known of the claim of the United States. Here, Plaintiffs filed this action on December 14, 2020. Their attempt to quiet title is barred if they knew or should have known of the United States' adverse claim by December 14, 2008.

To that end, Plaintiffs allege that since they acquired the property in 1956, they have continuously used a ditch (the "Main Ditch") off of Big Casino Creek to spread water across the property for residential and agricultural purposes. *Id*. at ¶¶ 36, 42; *see also* Shupe Aff. at ¶ 4 (Dkt. 1-1) ("At the time of the purchase, a ditch from a point of diversion located on Big Casino Creek one mile above the Property ran to the Property and was diverted thereon from various points of diversion into smaller ditches for use on the entire Property."). Plaintiffs allege that they maintained the Main Ditch on a yearly basis and utilized all of the available water "*until [their] rights were directly interfered with by the Forest Service*." Pls.' Compl. at ¶ 49 (Dkt. 1) (quoting Shupe Aff. at ¶ 5 (Dkt. 1-1) (emphasis added)). Plaintiffs allege that the Forest Service began to interfere with their water diversion in approximately 1972, after the creation of the SNRA. Shupe Aff. at ¶ 10 (Dkt. 1-1); *see also id*. at ¶ 5 (noting how Forest Service further prevented Plaintiffs from maintaining Main Ditch by blocking access thereto and issuing tickets).

---

[1] Plaintiffs identify Defendants as "the United States of America ("United States"), together with agencies thereof, that are charged with managing the federal lands adjacent to the Shupe Property . . . ." Pls.' Compl. at 7 (Dkt. 1); *see also id*. at ¶¶ 1-3 (listing United States, United States Department of Agriculture, and United States Forest Service as Defendants).

**MEMORANDUM DECISION AND ORDER - 2**

Through this action, Plaintiffs seek entry of a decree quieting title to their rights-of-way for accessing and conveying water from the diversion facilities on Big Casino Creek using the Main Ditch (described herein as the "point of diversion"). Pls.' Compl. at 5 (Dkt. 1).

Based on these same allegations, Defendants move to dismiss Plaintiffs' Complaint as time-barred. Defendants argue that Plaintiffs' quiet title claim accrued sometime between 1972 with the adoption of the SNRA, and 2006 when Plaintiffs complained that the Forest Service interfered with their right to access and use the point of diversion. *See generally* Defs.' Mem. ISO MTD (Dkt. 16-1). According to Defendants, because Plaintiffs' quiet title claim accrued before December 14, 2008, this action (filed more than twelve years later) is untimely and should be dismissed.

## II.  LEGAL STANDARD

Federal courts are courts of limited jurisdiction, possessing only those powers granted by the Constitution and statute. *United States v. Marks*, 530 F.3d 799, 810 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). The party asserting federal jurisdiction bears the burden of overcoming the presumption against it. *Kokkonen*, 511 U.S. at 377. A party may move to dismiss for lack of subject matter jurisdiction under the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(b)(1). Additionally, a court may raise the question of subject matter jurisdiction *sua sponte* at any time during an action. *United States v. Moreno-Morillo*, 334 F.3d 819, 830 (9th Cir. 2003). Regardless of who raises the issue, "when a federal court concludes that it lacks subject matter jurisdiction, the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing 16 J. Moore et al., *Moore's Federal Practice* § 106.66[1], pp. 106-88 to 106-89 (3d ed. 2005)).

Congress has provided subject matter jurisdiction and waived sovereign immunity for quiet title actions against the United States through the QTA. Under the QTA, the United States

**MEMORANDUM DECISION AND ORDER - 3**

may be named as a party defendant in a civil action to "adjudicate a disputed title to real property in which the United States claims an interest . . . ." 28 U.S.C. § 2409a(a). Importantly, Congress has only provided this cause of action to private actors when such an action "is commenced within twelve years of the date upon which it accrued." 28 U.S.C. § 2409a(g). The limitations period is jurisdictional and cannot be waived. *Wilkins v. United States*, 13 F.4th 791, 795 (9th Cir. 2021). It also must be strictly construed in favor of the government. *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983). "The running of the twelve-year limitations period deprives the federal courts of jurisdiction to inquire into the merits of an action brought under the QTA." *Kingman Reef Atoll Invs., LLC v. United States*, 541 F.3d 1189, 1195-96 (9th Cir. 2008) (quotation marks and citation omitted). Accordingly, if a complaint is filed outside of the QTA's statute of limitations, the court lacks jurisdiction and must dismiss. *Adams v. United States*, 255 F.3d 787, 796 (9th Cir. 2001).

Under the QTA, an action is "deemed to have accrued on the date the plaintiff or his predecessors-in-interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). The statutory term "should have known" imparts "a test of reasonableness." *State of Cal. Ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir. 1985). A claim accrues when the United States' actions would have alerted a reasonable landowner that the government claimed an interest in the land. *Shultz v. Dept. of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989).

Where a claimant seeks "fee title [to the property], notice of a government claim that created even a cloud on the title may be sufficient to trigger the limitations period." *McFarland v. Norton*, 425 F.3d 724, 726 (9th Cir. 2005). But as is the case here, where the claimant seeks a non-possessory interest such as an easement, "knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim." *Michel v. United States*, 65 F.3d 130, 132

**MEMORANDUM DECISION AND ORDER - 4**

(9th Cir. 1995). Thus, when a plaintiff claims a non-possessory interest, an action accrues only when the government, adversely to the interests of plaintiff, denies or limits the use of the alleged easement. *Id.* (citing *Werner v. United States*, 9 F.3d 1514, 1516 (11th Cir. 1993) (finding that limitations period on plaintiffs' claim of easement over government land had not run even though plaintiffs knew of government's title for more than twelve years)).

Under a Rule 12(b)(1) challenge, no presumption of truthfulness attaches to a plaintiff's allegations; a court may freely consider extrinsic evidence and it may resolve factual disputes with or without a hearing. *Kingman Reef*, 541 F.3d at 1195. "[T]he district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988).

### III.  DISCUSSION

Defendants' Motion is straightforward: Plaintiffs' Complaint must be dismissed because they brought this quiet title action more than twelve years after the government interfered with their access to the diversion facilities feeding the Main Ditch from Big Casino Creek. Defs.' Mem. ISO MTD at 5-6 (Dkt. 16-1). Plaintiffs disagree, arguing that (i) the QTA's twelve-year limitations period is not jurisdictional, (ii) their quiet title action is timely because the government has not asserted an interest adverse to their interests in the at-issue easement, and (iii) regardless, the government abandoned any prior adverse interest when it assisted Plaintiffs in establishing their claim. Pls.' Opp. to MTD at 6-20 (Dkt. 19). The Court addresses each of these arguments in turn and agrees with Defendants.

A.  **The QTA's Limitations Period is Jurisdictional**

Plaintiffs argue that the QTA's statute of limitations is not jurisdictional, essentially nullifying Defendants' Motion when it is premised on Rule 12(b)(1). *Id*. at 18-20. Instead,

**MEMORANDUM DECISION AND ORDER - 5**

Plaintiffs argue that Defendants' position is best analyzed under Rule 12(b)(6) for failure to state a claim and that, when more credence is lent to their allegations pursuant to that Rule, their quiet title claim should not be dismissed. *Id*. at 19-20 (discussing split in authority that "cast[s] doubt" on characterization of time-bars as jurisdictional in nature).

Whatever ambiguity existed on this subject at the time of the parties' briefing has since been resolved in *Wilkins*. There, the Ninth Circuit recently put the matter to rest, concluding in no uncertain terms that "the QTA's statute of limitations is jurisdictional." *Wilkins*, 13 F.4th at 794-95. Because the QTA's limitations period is jurisdictional, Defendants' Motion is properly brought under Rule 12(b)(1).

B.   **Plaintiffs' Quiet Title Action is Untimely**

Defendants argue that Plaintiffs' quiet title action is untimely because their own Complaint establishes that their predecessors-in-interest *actually* knew, let alone should have known, of the government's adverse interest in the involved property and point of diversion (i) by 1972 with the creation of the SNRA; (ii) that this alleged interference was so great by 2002 that they complained to United States Senator Larry E. Craig and the Custer County Commissioners (even threatening legal action); and (iii) that the Forest Service continued to interfere with their rights as of 2005-2006 by issuing tickets that prevented them from using the point of diversion at all. Defs.' Mem. ISO MTD at 5-6 (Dkt. 16-1) (citing Shupe Aff. at ¶¶ 5,10 (Dkt. 1-1); Ex. A to Barnes Decl. (Dkt. 16-4); Pls.' Compl. at ¶ 49 (Dkt. 1)).

In response, Plaintiffs contend that these "supposedly adverse actions" are insufficient to trigger the QTA's statute of limitations at any such corresponding points in time. Pls.' Opp. to MTD at 7 (Dkt. 19). They argue instead that the government's actions (i) amount to mere "regulatory control," not the assertion of an exclusive right to deny their claimed easement or right to access the point of diversion; and (ii) are at best "ambiguous or vague" regarding

**MEMORANDUM DECISION AND ORDER - 6**

Defendants' position on Plaintiffs' right to access the point of diversion. *Id.* at 7-16. These counterarguments fail to capture the true state of the record and are without merit.

    1.    <u>Plaintiffs and Their Predecessors-In-Interest Have Acknowledged That the Government's Conduct Denied or Limited Their Right to Access the Point of Diversion; It Was Not Mere "Regulatory Control"</u>

For an easement across government property, the QTA's limitations period begins to run once the government denies or limits the use of that easement; regulatory or supervisory actions are not enough. *Michel*, 65 F.3d at 132; *see also McFarland*, 425 F.3d at 727 ("To avoid forcing landowners and the government into premature and often unnecessary suits, we should not lightly assume that regulatory or supervisory actions, as opposed to those that deny the easement's existence, will trigger the statute of limitations. Were it not so, any regulation of a property interest would challenge ownership of the interest itself.") (internal quotation marks and citation omitted). Relying on this important distinction, Plaintiffs argue that the government's ban of motorized traffic in the SNRA was "nothing more than a 'generally appliable regulation'" and that their complaints in 2002 simply reflected outrage over this regulation – neither of which triggered the QTA's statute of limitations. Pls.' Opp. to MTD at 12 (Dkt. 19) (citing *McFarland*, 425 F.3d at 727). The Court disagrees.

It is true that the government, in its capacity as the owner of an alleged servient tenement, has "the right to reasonable use of its land" and that "mild interference with the use of an easement pursuant to the government's own property interests will not start the statute of limitations running." *McFarland*, 425 F.3d at 727. But where that interference amounts to a denial of access, an action to quiet title begins *at that point* and the statute of limitations begins to run. *See id*. at 727-28 ("Because McFarland claims title to an easement, his action accrued only when he or his predecessors-in-interest 'knew or should have known the government claimed the exclusive right to deny their historic access' to Glacier Route 7. . . . Unless the

**MEMORANDUM DECISION AND ORDER - 7**

installation of gates is coupled with a denial of access, there is no easement infringement.") (quoting *Michel*, 65 F.3d at 132). The relevant caselaw – cited by both Plaintiffs and Defendants – confirms this understanding. *Compare* Defs.' Mem. ISO MTD at 6 (Dkt. 16-1), *with* Pls.' Opp. to MTD at 9-12 (Dkt. 19), *and* Defs.' Reply ISO MTD at 4-5 (Dkt. 24).

For example, in *McFarland*, the Ninth Circuit found that road closures, barriers, and gates, without more, did not rise to the level of a denial of access sufficient to signal the government's exclusive control over the disputed roads. *McFarland*, 425 F.3d at 727-28. While those closures, barriers, and gates may have barred members of the public from using Glacier Route 7, exceptions existed for local residents – including the plaintiff-appellant – who required access over Glacier Route 7 to access their real property. *Id*. For those residents, there was no denial of access that triggered the limitations period. *Id*. at 728 ("Because McFarland was not denied year-round access when he desired it until 1999, he did not know nor should he have known that the government disputed his claim to an easement. The statute of limitations did not run and McFarland is entitled to pursue his [QTA] claims in district court on remand.").

Following *McFarland's* lead, the Ninth Circuit in *Skranak v. Castenada* (decided the day after *McFarland* and by the same three-judge panel) likewise recognized that the conversion of a road into a biking and hiking trail may have barred the public's vehicular access, but "would not have necessarily been inconsistent with the [plaintiff-appellants'] predecessors-in-interests' easement[.]" 425 F.3d 1213, 1217 (9th Cir. 2005). Unlike *McFarland*, however, the trail conversion in *Skranak* nonetheless amounted to a denial of access because the stakeholders could no longer access their mines. *Id*. ("Because converting the road to a trail barred access in a way that was neither temporary nor obviously overcome by the securing of a permit or special permission, the Skranaks' predecessors-in-interest should have been put on notice."). Further, as relevant here, the court critically relied upon public comments by the stakeholders as evidence of

**MEMORANDUM DECISION AND ORDER - 8**

acknowledgment of denial of access that sufficed to start the statute of limitations running. *Id*. ("In addition, Henry Skranak appears to have been well aware that the Forest Service was adverse to his claimed right of access.  In 2000 he stated that he 'ha[d] been denied access for more than 39 years.'  In a 1991 letter, he complained that '[d]ue to the policy of the Department of Agriculture and the Forest Service over the years, we have been barred out by berms, Kelly ditches, arrests and fines.'  Such was sufficient to start the statute of limitations running and thus to defeat the Skranaks' ability to bring a quiet title action.  Therefore, . . . the district court is instructed to dismiss for lack of jurisdiction.").

These cases frame the lynchpin issue now before the Court: whether Defendants' alleged interference effectively denied Plaintiffs the ability to access and use the point of diversion before December 14, 2008.  Plaintiffs argue it did not.  But much like *Skranak,* Plaintiffs' own statements over the years are inconsistent with this construction.  For example:

- Plaintiffs' Complaint matter-of-factly alleges that "the Forest Service unlawfully blocked the Shupes' access road to the point of diversion."  Pls.' Compl. at 3 (Dkt. 1); *see also id*. at 17 & ¶ 45.

- Plaintiffs' Complaint alleges that "'their rights *were directly interfered with by the Forest Service*.'"  *Id*. at ¶ 49 (Dkt. 1) (emphasis added) (quoting Shupe Aff. at ¶ 5 (Dkt. 1-1) (as of August 2015, Merrill Shupe stating: "[From 1956], the Family continued to maintain the point of diversion . . . on a yearly basis and utilized all of the available water until our rights were directly interfered with by the Forest Service *several years ago*.") (emphasis added)).

- Merrill Shupe stated that *"[t]he problems with respect to accessing our water began after the creation of the [SNRA] in approximately 1972*.  In recent years, there have been repeated encroachments on the water right-related property rights and interests of the Shupes by SNRA and Forest Service personnel.  These include the recent interference with and denial of access to our point of diversion and ditch."  Shupe Aff. at ¶ 10 (Dkt. 1-1) (emphasis added).

- Merrill Shupe stated that "[t]he only reason we did not continue to maintain the point of diversion . . . was *because we were prevented from doing so by the Forest Service*, who felled trees on and otherwise blocked our access thereto.  Also, on occasion, members of the Shupe Family were given tickets and/or asked to leave the area by agents of the Forest

**MEMORANDUM DECISION AND ORDER - 9**

Service. We have continually objected to these actions by the Forest Service." *Id*. at ¶ 5 (emphasis added).[2]

- In October 2001, Karl Shupe relayed his "concern of closing the existing road past our gate for maintaining and having accessibility to our irrigation ditch and head gate" and how "[r]elocating the trail would definitely limit the only access for 4-wheel accessibility through our property in which the gate can be locked." Ex. A to Barnes Decl. at 3 of 18 (Dkt. 16-4).

- Around this same time, "The Shupe Brothers" variously described the situation as follows:

  o "The specific problems we have encountered at Casino Creek are a major concern. This is the second time in forty-five years that we fear intimidation, uncertainty, and intrusion into our private rights, privileges, and freedom by the Forest Service or more specifically the SNRA." *Id*. at 10 of 18.

  o "The new recent atrocity of the SNRA is to close off the Casino Creek road and trail to nothing but foot, bicycle, and 2-wheeled vehicles. The property at Casino Creek has been a sacred place to us, but has been greatly jeopardized by the Forest Service throughout the many years, but especially with their last attempt to restrict our private, personal rights, freedoms, and privileges." *Id*.

  o "The latest unjust indulgence on our property concerns their attempt to create a new Big and Little Casino trail. They are attempting to eliminate the existing road and trail turning it into a special bicycle trail. We purchased the Casino property in 1957 and have used this road to maintain our diversion gate providing water to this acreage, and also to repair and maintain fence lines around the property." *Id*.

  o "On Labor Day of last year there appeared several vehicles and people at the trailhead, located on government land, directly adjacent to our private property. The following day we noticed that these people had put up several signs designating these roads and trails as "off-limits" to any motorized vehicle. This immediately raised a red flag, *because we use these roads to maintain constant repair, maintenance, and beauty of our private property*." *Id*. at 11 of 18 (including pictures of referenced signs) (emphasis added).

  o "I contacted [Jay] Dorr by phone informing him of our concern about our access to the water and fencing responsibilities. . . . I then posed the question, 'you mean to tell me that I have to walk the ¾ mile to correct the water flow to our property?'

---

[2] The Forest Service's records reveal that the most recent tickets were issued in 2005 and 2006. Stuart Decl. at ¶¶ 4-7 (Dkt. 16-2). Plaintiffs argue that Defendants' reliance on these citations is "not well-placed," pointing out that they did not relate to the point of diversion or Plaintiffs' alleged easement interests. Pls.' Opp. to MTD at 8 (Dkt. 19). Except it's Plaintiffs, through Merrill Shupe's affidavit, who are relying on these citations to establish interference with their use of the alleged easement for the purposes of their quiet title action.

**MEMORANDUM DECISION AND ORDER - 10**

His response was one word, 'yes.' This type of response is damn arrogant and refutable. We had no previous word or communication that they were going to put restrictions on this road." *Id*. at 12 of 18.³

- "In World War II one finds some 13 years of sacrifice and danger given by the four property owners to the security, defense, freedom, and private rights of the nation, and then to have several individuals in the Forest Service, sitting in their cushioned chairs, taking away our private rights. Now at the ages of 81, 79, 77, and 75 they want us to walk ¾ of a mile to turn on our water. Carry three-feet-diameter metal pipe up the mountain side to repair washed out areas, and climb the steep mountain side to repair the fences. This is ludicrous and despicable to be victim of such actions." *Id*.

- "This summer my grandson was riding a 4-wheeler across this so-called off-limit area, and was confronted by a Forest Service officer, wearing an official badge and carrying a gun on his side. Although the conversation was amiable, he was informed that it was restricted to such vehicles. And it would be closed by the minds and desires of certain activities who have an aversion to motorized vehicles." *Id*. at 13 of 18.

- "The two hours with [Ed Cannady] were very cordial and polite as we discussed the problems and possible solutions. His closing remarks were not so pleasant because he informed me that there could be a possibility that the Forest Service could issue a special permit allowing us to use a motorized vehicle to perform our work on the ditch. With the many atrocities invoked upon us in the past by the deceitful mannerisms of the Forest Service, it causes me to think that this is mere lip service rather than a legal, legitimate, document. The anxious, deceitful movement by the extreme environmentalists to close down this road would have never occurred if the original supervisors would have not lied about their intents of the area." *Id*.

- "The original intent of the SNRA was to protect and manage the designated area in such a manner as to protect the pristine beauty of the area. This should be done by close contact with the private landowners. In order to do it, the Forest Service needs the support, cooperation, and dollars of the private sector to fulfill the demands of the original document. By taking away our freedom, legal rights, and privileges, it has created numerous battlefields. *One of these battlefields is my legal right to obtain water, get access to fence lines without using only my two feet to do so*. Promises by the Forest Service are not enough, because the promises contain no validity.

---

³ Mr. Dorr worked on the Sawtooth National Forest from 1971 until 2018. Dorr Decl. at ¶ 2 (Dkt. 35-1). He worked as the Trails Manager for the SNRA from approximately 1983 until 2018. *Id*. Mr. Dorr apparently documented this phone call with Merrill Shupe, noting the following: "Big Casino Landowner. Concerned about barriers/signs put in over Labor Day. His family has canal/diversion off of Big Casino Creek. He wants ATV access to diversion." Ex. A to Barnes Decl. at 2 of 18 (Dkt. 16-4).

**MEMORANDUM DECISION AND ORDER - 11**

**Some very concerned landowners – The Shupe Brothers.**" *Id*. at 14 of 18 (italics added, bold in original).[4]

- In May 2002, Merrill Shupe wrote a letter to Senator Craig. Therein, Mr. Shupe stated in relevant part:

  o "On careful evaluation it appears that the SNRA is attempting to eliminate human access to Forest Service lands for ranching, recreation, business, and other worthwhile projects." *Id*. at 5-6 of 18.

  o "Our major concern revolves around the attempt to close the existing Big and Little Casino Creek road and transform it to a bicycle and hiking trail. At this meeting with the Commissioners, *we voiced deep concern over our private rights to gain access to our water diversion gate in Big Casino Creek.* Following our presentation to the Commission regarding this very problem, Deb Cooper (SNRA director) remarked, 'We have already taken this into consideration and we will give the Shupe Brothers a special permit to gain access to the gate.' Our reaction to this was abrupt and negative to such a suggestion. Presently we have legal right to the existing road, permitting access to the head gate, property and existing fence lines. The SNRA is desirous to usurp our private rights and privileges." *Id*. at 6 of 18 (emphasis added).

  o "I appeal to the congressmen and senators of the state for help and support. If necessary we will carry this *'raping of private property owners'* into the judicial system." *Id*. at 7 of 18 (emphasis added).[5]

---

[4] Newspaper coverage mirrors the Shupe Brothers' frustration during this same timeframe. Ex. A to Barnes Decl. at 9 of 18 (Dkt. 16-4) (October 11, 2001 article recounting October 9, 2001 meeting of the Custer County Commissioners, stating in part: "Merrill Shupe, speaking on behalf of his family who own property on Casino Creek, said *the SNRA had restricted their access to an irrigation diversion gate and their fence lines. Shupe said for years his family had used an established road to maintain water on their private property and also used the road to access fence lines for repair and maintenance. . . . Shupe said that without notice, the road was signed for either no motorized use or for use by two-wheeled motor vehicles only*. He called to find out what was up and in his discussions found out he could drive a motorcycle up the road if he wanted, but not a four-wheeler or pickup. He said he didn't like motorcycles, and the response was that he could then walk the three-quarter mile to his diversion gate.") (emphasis added).

[5] On June 4, 2002, Ms. Cooper responded to Senator Craig, stating in part that (i) the Shupes have used four-wheel vehicles without authorization to access the point of diversion; (ii) the road has been closed to four-wheel vehicles since at least 1979; (iii) The SNRA has frequently posted signs advising that the trail was for two-wheel, foot, and horse only; and (iv) the Forest Service is planning to issue a special use permit providing legal access to the Shupes. Ex. A to Barnes Decl. at 17 of 18 (Dkt. 16-4). No special use permit has ever been issued to Plaintiffs.

**MEMORANDUM DECISION AND ORDER - 12**

These statements confirm that Plaintiffs, through their predecessors-in-interest, viewed the government's actions as inconsistent with their purported right of access to the point of diversion as of the early 2000's. *See Skranak*, 425 F.3d at 1217; *Sawtooth Mtn. Ranch LLC v. United States*, 2022 WL 558354, at *7 (D. Idaho 2022) (referencing earlier correspondence from predecessors-in-interest as "reflect[ing] the Pivas were aware of the potential for extensive public use of a summer trail."). Although the *exact* date is not integral here, it is clear to the Court that Plaintiffs were thus "reasonab[ly] aware[ ] that the government claim[ed] some interest adverse to the [P]laintiffs[']" before December 14, 2008.⁶ *Sawtooth Mtn. Ranch*, 2022 WL 558354, at *7. This started the limitations period at that unspecified time and renders Plaintiffs' quiet title action (in any event, filed more than twelve years later) untimely.

2.  <u>The Government's Alleged Interference Put Either Plaintiffs or Their Predecessors-In-Interest on Notice of the Government's Adverse Claim; It Was Not "Ambiguous or Vague"</u>

The QTA's "statute of limitations is not triggered . . . when the United States' claim is ambiguous or vague." *Shultz*, 886 F.2d at 1160; *but see Sawtooth Mtn. Ranch*, 2002 WL 558354, at *7 ("This standard does not require the government to provide explicit notice of its claim, nor must the government's claim be 'clear and unambiguous.'") (quoting *State of N. Dakota ex rel. Bd. of Univ. & Sch. Lands v. Block*, 789 F.2d 1308, 1313 (8th Cir. 1986)). Plaintiffs argue that, here, the "government has been, at most, ambiguous or vague regarding its position on [their] right to access and use the point of diversion." Pls.' Opp. to MTD at 13 (Dkt. 19). To prove this, they point to how the government "has consistently recognized [their] right-

---

⁶ Apart from the above-referenced statements, the government's internal correspondence in 2014 (addressing, in part, "water rights, ditch, access, and point of diversion (headgate)") additionally reveals that "[t]he Shupes have not been able to access water to their property *for 10 plus years due to access. Citations, verbal warnings, and the access to the point of diversion have prohibited them from getting the water*." Ex. A to Appel Decl. at 19 of 34 (Dkt. 19-2).

**MEMORANDUM DECISION AND ORDER - 13**

of-way claim" and even "worked with [them] to gather information to support that claim." *Id*. Plaintiffs' argument overstates the government's actual involvement in the matter.

To begin, there is no dispute that, in the past, Plaintiffs have claimed a statutory right to access and use the point of diversion under Revised Statute (RS) 2339. *See* 43 U.S.C. § 661 (section of Mining Act of 1866 providing that those who held vested water rights also held separate and independent right-of-way for construction of ditches and canals). But the government's simple recognition of those efforts, and Plaintiffs' attempts at perfecting such a claim, do nothing to alter the landscape here. Indeed, the RS 2339 process exists to verify an historic right of access in federal court when certain criteria are met. Accordingly, Plaintiffs' pursuit of an RS 2339 claim actually acknowledges the unsettled nature of Plaintiffs' alleged property rights in the point of diversion during this time.

Moreover, that the government may have even engaged with Plaintiffs as part of the RS 2339 process is of no particular moment. Referencing a July 29, 2016 letter from Kathryn Conant, the Director of Lands and Minerals for the United States Department of Agriculture, Plaintiffs claim that the government "recognized that [Plaintiffs] had a cognizable claim" and "did not deny the validity of [their] claim." *Id*. (citing Ex. C to Appel Decl. at 28 of 34 (Dkt. 19-2)). The Court can't agree. In that letter, Ms. Conant actually indicated that the Plaintiffs had not presented sufficient evidence to the Forest Service to support their claim to a right-of-way. Ex. C to Appel Decl. at 28-29 of 34 (Dkt. 19-2) ("When the owner of a water facility asserts a claim to a right under the Act, it is your responsibility to provide the Forest Service with evidence that demonstrates the existence of a valid water right, and that the subject facility was constructed and made operational on or before the date that the Federal land which it now occupies was reserved from the public domain. Based upon the information in Enclosures I and II, *please reevaluate whether or not you believe that your family meets the above limitations of*

**MEMORANDUM DECISION AND ORDER - 14**

*the provisions of the Act . . . .*") (emphasis added).  If anything, this cuts against Plaintiffs' argument.

The same goes for the June 26, 2017 email from Randy Miller, a Forest Service Land Surveyor.  There, Mr. Miller discussed with Plaintiffs' attorney how to possibly satisfy certain of RS 2339's requirements moving forward.  *Id*. at 30-31 of 34 ("I have some thoughts on how we might bridge that gap in time, if it is to be done, and also a thought about the reservation language in the Hershey patent.  First, bridging that gap: is it possible that we might find a museum or historical society with assayer records for the Yankee Fork mining district?  These records might establish a definitive residence for Hershey based on his assayed samples or mill site production receipts.").  But again, this correspondence succeeds only in highlighting the *questions* surrounding Plaintiffs' claim to a statutory right-of-way, not the government's endorsement of it.[7]  *Id*. at 31 of 34 ("The gap in time we have leaves us hanging without being able to definitively say, yes, this is a valid ROW or no it isn't.").  Put simply, the Forest Service may have been willing to consider and evaluate any evidence to support Plaintiffs' claim.  This is not unusual.  Ultimately, however, the Forest Service never affirmatively recognized the existence of Plaintiffs' statutory right-of-way.

Finally, as a practical matter, Plaintiffs' argument begs the question: if the government's conduct was so vague and ambiguous that it never actually denied that Plaintiffs had a valid claim to an easement, has Plaintiffs' QTA claim ever accrued?  *See* Pls.' Opp. to MTC at 13 (Dkt. 19) (citing Appel Decl. at ¶ 21 (Dkt. 19-2) ("At no time in the course of my representations

---

[7] Additionally, Mr. Miller's *authority* to bind the United States' position is questionable. *See Kingman Reef*, 541 F.3d at 1201 ("[T]he United States cannot be deemed to have abandoned a claim of ownership for purposes of § 2409a(g) unless it 'clearly and unequivocally abandons its interest,' as evidenced by documentation from a government official with authority make such decisions on behalf of the United States.") (quoting *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001)).

**MEMORANDUM DECISION AND ORDER - 15**

of the Shupes has any Forest Service employee or attorney ever suggested to me that the Forest Service had . . . asserted a claim adverse to the Shupes' Claim . . . .")). Said another way, when did Plaintiffs' existing QTA claim accrue if not when the government denied their access to their alleged easement? *See* 28 U.S.C. § 2409a(a) (waiving sovereign immunity to adjudicate "disputed title"); *Mills v. United States*, 742 F.3d 400, 405 (9th Cir. 2014) ("In construing the scope of the QTA's waiver, we have read narrowly the requirement that the title at issue be 'disputed.'"). The Court does not attempt to answer these rhetorical questions, except to say that Plaintiffs have already alleged that "the Forest Service unlawfully blocked" access to the point of diversion and that their "rights were directly interfered with by the Forest Service." Pls.' Compl. at 3, 17, ¶¶ 45 & 49 (Dkt. 1) (citing Shupe Aff. at ¶¶ 5-6 (Dkt. 1-1)).

At bottom, "[a]n appreciation of the full contours of the Forest Service's claim is not needed to start the QTA's clock. It is enough that Plaintiffs or their predecessors-in-interest were aware of the existence of an adverse right held by the government." *Sawtooth Mtn. Ranch*, 2002 WL 558354, at *8. Here, such notice clearly existed. *See supra*. The government's consultation with Plaintiffs regarding the RS 2339 process does not change this fact.

C.   **The Government Did Not Abandon Its Adverse Claim**

Plaintiffs alternatively argue that, even if Defendants are able to show that the government asserted an interest adverse to Plaintiffs' interest in the point of diversion before December 14, 2008, the government later abandoned its adverse claim, thereby starting the statute of limitations anew and undercutting its Motion. Pls.' Opp. to MTD at 16 (Dkt. 19). To be sure, "if the government abandons its claim and subsequently reasserts its interest, the later assertion is treated as a new claim for statute of limitations purposes." *Middle Fork Holding Co., Inc. v. U.S.*, 2010 WL 107380, at *3 (D. Idaho 2010) (citing *Shultz*, 886 F.2d at 1161 ("The statute of limitations provision in the QTA cannot reasonably be read to imply that if the

**MEMORANDUM DECISION AND ORDER - 16**

government has once asserted a claim to property, twelve years later any quiet title action is forever barred.")).  To prove abandonment of an interest in an easement (as opposed to where fee ownership is claimed), "the key inquiry is whether the government's actions and communications would give plaintiff or its predecessors-in-interest 'reason to believe the government did not continue to claim an interest in the property.'"  *Middle Fork Holding*, 2010 WL 107380 at *4 (quoting *Shultz*, 886 F.2d at 1161).

Plaintiffs submit that the same pieces of correspondence that suggest ambiguity in the government's conduct also amount to the government's abandonment of its adverse claim to Plaintiffs' interests.  Pls.' Opp. to MTD at 17-18 (Dkt. 19) ("Such communication and action on the part of the government would not suggest to a reasonable landowner that the government claimed or continued to claim an exclusive right to control access over the Shupes' easement.").  This argument has already been rejected.  *See supra*.

As discussed above, the government's exchanges with Plaintiffs about the RS 2339 process generally, and Plaintiffs' attempts at demonstrating that statutory right specifically, do not amount to abandonment.  *Id*.; *see also, e.g.*, *Dunbar v. United States*, 2009 WL 10701825, at *3 (D. Mont. 2009) ("[T]hese letters tend to show only that, while Dunbar was 'eligible' for an easement, the Forest Service did not believe he had an easement.  Based on the language of these letters, it was not reasonable for Dunbar to believe the Forest Service had abandoned its claim.").  Simply put, notwithstanding its consultation with Plaintiffs, the government never formally changed its adverse position.

An absence of formal action by the government distinguishes Plaintiffs' reliance on *Middle Fork Holdings*.  Pls.' Opp. to MTD at 18 (Dkt. 19).  There, this Court held that the government abandoned its claim when the Forest Service issued an *administrative determination* that the plaintiffs' right-of-way claim was valid.  *Middle Fork Holdings*, 2010 WL 107380, at

**MEMORANDUM DECISION AND ORDER - 17**

Case 1:20-cv-00561-REP   Document 38   Filed 03/31/22   Page 18 of 18

*4-5.  No such formal confirmation exists here.  It therefore cannot be said that the government has abandoned any adverse prior claim that Plaintiffs did not have a right to access and use the point of diversion.

## IV.  CONCLUSION

Plaintiffs have not met their burden of proving that their claim falls within the QTA's statute of limitations, and thus, that this Court has subject matter jurisdiction over it.  Rather, the record reflects that, before December 14, 2008, Plaintiffs and their predecessors-in-interest understood that the government was limiting their alleged right to access and use the point of diversion.  That interference was not the product of mere "regulatory control," nor was it vague and ambiguous.  Because the government never abandoned its adverse claim, the QTA's twelve-year limitations period precludes Plaintiffs' QTA action.

## V.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (Dkt. 16) is GRANTED.



DATED:  March 31, 2022

_____
Honorable Raymond E. Patricco
United States Magistrate Judge